No. 25-5034

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

COW CREEK BAND OF UMPQUA TRIBE OF INDIANS, THE KARUK TRIBE,
and TOLOWA DEE-NI' NATION,

*Plaintiff-Appellants*,

v.

U.S. DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM,
SECRETARY; U.S. BUREAU OF INDIAN AFFAIRS; BRYAN MERCIER,
ACTING ASSISTANT SECRETARY; and RUDY PEONE,

*Defendant-Appellees*,

v.

COQUILLE INDIAN TRIBE,

*Intervenor Defendant-Appellee*,

_____

ON APPEAL FROM AN ORDER DENYING AN INJUNCTION OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
Hon. Amit P. Mehta
Case No. 24-cv-03594-APM

_____

**EMERGENCY MOTION FOR INJUNCTIVE
RELIEF REQUESTED BY FEBRUARY 27, 2025**

_____

Gabriel S. Galanda
Rachel R. Tobias
Shelby R. Stoner
**GALANDA BROADMAN PLLC**
P.O. Box 15146
8606 35th Avenue NE, Ste. L1
Seattle, WA 98115
T: 206-557-7509
F: 206-299-7690
gabe@galandabroadman.com
rtobias@galandabroadman.com
shelby@galandabroadman.com

*Attorneys for Plaintiff-Appellant Cow
Creek Band of Umpqua Tribe of
Indians*

Glenn M. Feldman
**PROCOPIO, CORY,
HARGREAVES & SAVITCH LLP**
4800 N. Scottsdale Road, Ste. 2000
Scottsdale, AZ 85251
T: 480-682-4312
F: 619-788-5521
glenn.feldman@procopio.com

*Attorney for Plaintiff-Appellant The
Karuk Tribe*

Richard J. Armstrong
**ARMSTRONG LAW OFFICE**
1750 Prairie City Road, Ste. 130-238
Folsom, CA 95630
T: 916-337-2639
armstrong@gaminglawpc.com

*Attorney for Plaintiff-Appellant Tolowa
Dee-ni' Nation*

**TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................6

II.   RELEVANT BACKGROUND...............................................9

  A.  Factual Background...........................................................9
     1.   Coquille............................................................9
     2.   Cow Creek ......................................................10
     3.   Karuk ...............................................................11
     4.   Tolowa .............................................................11
     5.   Cow Creek, Karuk, and Tolowa's Interests....................12

  B.  Procedural Background .....................................................16
     1.   Coquille's application to establish a second casino in Medford. ....16
     2.   Defendants issued the FEIS and ROD...............................18

III.  JURISDICTION ..............................................................20

IV.   INJUNCTION STANDARD .............................................20

V.    ARGUMENT ...................................................................21

  A.  Plaintiffs Are Likely to Succeed on the Merits...............................21

  C.  Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief. .......24

  D.  Balance of Hardships and Public Interest Tip in Plaintiffs' Favor. ....26

VI.   CONCLUSION ...............................................................28

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*Axon Enter., Inc. v. F.T.C.*, 598 U.S. 175 (2023) ......................................... 23

*Alpine Sec. Corp. v. FINRA*, No. 23-5129,

    2023 WL 4703307 (D.C. Cir. July 5, 2023) ............................... 23–24

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ......................................... 20

*Confederated Tribes of Chehalis Reservation v. Mnuchin*,

    456 F. Supp. 3d 152, 164 (D.D.C. 2020) ........................................... 25

*League of Women Voters of U.S. v. Newby*,

    838 F.3d 1 (D.C. Cir. 2016) ........................................ 23, 26

*Marin Audubon Soc. v. Fed. Aviation Admin.*,

    121 F.4th 902 (D.C. Cir. 2024) ........................................ 6, 21–23, 26

*Mexichem Fluor v. Env't Prot. Agency*,

    866 F.3d 451 (D.C. Cir. 2017) ........................................... 20

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021) ................... 25, 26

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,

    559 F.2d 841 (D.C. Cir. 1977) ..................................... 20, 24

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......................... 20


**<u>Statutes</u>**

5 U.S.C. § 705 ....................................................................................... 7

25 U.S.C. § 691 ..................................................................................... 9

25 U.S.C. § 2719 ................................................................................. 16

25 U.S.C. § 5101 ................................................................................. 16

28 U.S.C. § 1292 ................................................................................. 19

Pub. L. No. 588, 68 Stat. 724 (Aug. 13, 1954) ............................................. 8

Pub. L. No. 101-42, 103 Stat. 91 (June 28, 1989) .............................. 8, 9, 16

Pub. L. No. 97-391, 96 Stat. 1960 (Dec. 29, 1982) ...................................... 9

## Other Authorities

25 C.F.R. part 151 ................................................................. 16

25 C.F.R. § 151.13 .......................................................... 18, 26

25 C.F.R. § 559.2(a) (2024) ...................................... 6, 19, 26

40 C.F.R. Part 1500 ...................................................... 21–22

43 C.F.R. part 46 .................................................................. 22

43 C.F.R. § 46.10 ................................................................. 22

43 C.F.R. § 46.20 ................................................................. 22

43 C.F.R. § 46.415 ............................................................... 22

85 Fed. Reg. 55026, 55026 (Sep. 3, 2020) ......................... 16

86 Fed. Reg. 73313, 73313 (Dec. 27, 2021) ................. 16, 17

87 Fed. Reg. 11084, 11084 (Feb. 28, 2022) ....................... 17

87 Fed. Reg. 72505, 72505 (Nov. 25, 2022) ...................... 17

89 Fed. Reg. 92717, 92717 (Nov. 22, 2024) ...................... 18

Executive Order 11991 ........................................................ 21

Fed. R. App. P. 8 ..................................................... 5, 6, 7, 20

Fed. R. App. P. 26.1 ............................................................... 7

Fed. R. Civ. P. 62 ................................................................... 7

D.C. Cir. R. 8 ................................................................. 7, 20

D.C. Cir. R. 26.1 .................................................................... 7

D.C. Cir. R. 27 .............................................................. 7, 20

## I.    INTRODUCTION

Plaintiff-Appellees Cow Creek Band of Umpqua Tribe of Indians ("Cow Creek"), Karuk Tribe ("Karuk"), and Tolowa Dee-ni' Nation ("Tolowa")—a coalition of Tribal nations in Oregon and California ("Plaintiff Tribal Nations" or "Plaintiff-Appellants")—file this emergency motion for an injunction pending appeal of the D.C. District Court's denial of a preliminary injunction under Federal Rule of Appellate Procedure ("FRAP") 8(a)(2).

Plaintiff Tribal Nations seek judicial review of the unconstitutional final decision of Defendant U.S. Department of the Interior ("DOI") and its officers and sub-agencies ("Federal Defendants"), approving Intervenor-Defendant Coquille Indian Tribe's ("Coquille") application to take a parcel of land in Medford, Oregon into trust for Coquille's second, 45-acre Reservation and for a second casino resort, located 170 miles from Coquille's existing Reservation. Plaintiffs challenge Defendants' (1) Final Environmental Impact Statement ("FEIS") issued on November 22, 2024, pursuant to the National Environmental Policy Act of 1969 ("NEPA"), and (2) Record of Decision ("ROD") issued January 10, 2025.

Federal Defendants' issuance of the FEIS and ROD was *ultra vires*. The FEIS—and its underlying determination that Coquille's Medford casino poses no relative environmental or economic impact—was based entirely on the Council for Environmental Quality ("CEQ")'s regulations implementing NEPA. However, ten

6

days before the FEIS was issued, the D.C. Circuit held CEQ's regulations are *ultra vires* and invalid under separation of powers principles. *See Marin Audubon Soc. v. Fed. Aviation Admin*., 121 F.4th 902 (D.C. Cir. 2024). Federal Defendants disregarded the *Marin Audubon* decision and issued the ROD ten days before the change in Presidential administrations, causing "here-and-now" injuries by subjecting Plaintiff Tribal Nations to an unconstitutional NEPA review process.

One day after the ROD was issued, on January 11, 2025, Intervenor-Defendant Coquille started illegally operating a casino with 30-150 gaming machines (and counting) on the Medford trust parcel. According to the National Indian Gaming Commission ("NIGC"), Coquille's actions violate federal law because the NIGC did not receive 120-day notice of the new gaming facility after the NIGC denied Coquille's request to expedite or waive the notice provision. *See* 25 C.F.R. § 559.2(a). Nevertheless, on February 19, 2025, the district court denied Plaintiff Tribal Nations' motion for a temporary restraining order and a preliminary injunction, and either denied or ignored their request for an injunction pending appeal, finding insufficient harm to Plaintiff Tribal Nations. Ex. 1; FRCP 62(d); FRAP 8(a)(2)(ii).

Plaintiff Tribal Nations seek an emergency injunction to enjoin Intervenor-Defendant Coquille from conducting gaming activities on the Medford parcel

pending this appeal.[1] Plaintiff-Appellants are likely to prevail on the merits of their claims for declaratory and injunctive relief. Absent preliminary injunctive relief pending appeal, Plaintiff-Appellants will suffer not only "here and now" constitutional injuries and immediate harm to their cultural and historical interests, but also irreparable harm to their economies and abilities to fund essential government programs and services for Tribal members. Plaintiff-Appellants further demonstrate both the balance of hardships and the public interest weigh in favor of granting the requested injunctive relief.

On February 19, 2025, Plaintiff-Appellants notified Federal Defendants and Intervenor-Defendant Coquille, by telephone and email, of their intent to seek an emergency injunction pending appeal. FRAP 8(a)(2); D.C. Cir. R. 8, 27(e).

Plaintiff-Appellants' FRAP 26.1 disclosure statements are appended to this Motion, and the following documents are attached as exhibits: Order denying the preliminary injunction and necessarily denying the request for an injunction pending appeal (attached as **Exhibit 1**); relevant portions of the record below (attached as **Exhibits 2-20**).

---

[1] Alternatively, Plaintiffs seek an affirmative injunction divesting Federal Defendants of title to the Medford parcel, which would restore the status quo as of January 9, 2025. *See* FRAP 8(a)(2)(ii); 5 U.S.C. § 705.

## II.    RELEVANT BACKGROUND

### A.    Factual Background

#### 1.    Coquille

Aboriginally, Coquille inhabited the watershed of the Coquille River system on the southern Oregon coast. Ex. 2 (Galanda Decl., Ex. 3) (Whelan Report dated 3/18/22, pp. 389-428). Coquille's aboriginal territories do not include what is today known as Medford or Jackson County, Oregon. Ex. 14 (Beckham Decl. ¶11).

Coquille's status as a federally recognized Indian tribe was terminated by Congress in 1954. Pub. L. No. 588, 68 Stat. 724 (Aug. 13, 1954).  In 1989, Congress passed the Coquille Restoration Act ("CRA"), restoring Coquille to federal recognition, establishing a service area "composed of Coos, Curry, Douglas, Jackson and Lane Counties," and providing for the establishment of a reservation in Coquille's homelands in Coos and Curry Counties. Pub. L. No. 101-42, 103 Stat. 91 (June 28, 1989). The CRA mandates the DOI Secretary ("Secretary") acquire "no more than 1,000 acres of land in Coos and Curry Counties" for Coquille, which was satisfied in 1994. *Id.* § 5(a); Ex. 2 (Galanda Decl., Ex. 2 (FEIS, Vol. II, p. 2-28)).[2] The CRA also clarifies the Secretary *may* acquire additional land for Coquille within

---

[2] The United States currently holds 6,434 acres in trust for Coquille, including its 954-acre reservation and 5,400 acres of timberland, in or near Coquille's aboriginal territory. Ex. 2 (Galanda Decl., Ex. 2 (FEIS, Vol. II, p. 2-28)).

its service area "pursuant to [the Secretary's discretionary] authority under the [IRA]." Pub. L. No. 101-42, § 5(a).

Since 1995, Coquille has operated the Mill Casino Resort ("Coquille's first casino"), a 30,000-square foot Indian gaming facility on trust land within its first reservation in North Bend, Oregon. Ex. 2 (Galanda Decl., Ex. 2 (FEIS, Vol. II, p. 1-2)). North Bend is about 170 miles from Medford. *Id.*, Ex. 3 (Whelan Report, p. 9); Ex. 3 (Keene Decl. ¶16). Coquille's first casino prospers due to its oceanfront location on the Oregon coast. Ex. 2 (Galanda Decl., Ex. 3 (Whelan Report p. 9)).

### 2.     *Cow Creek*

For more than 1,000 years, Cow Creek inhabited the inland areas of southern Oregon, in what is today Douglas County. Ex. 2 (Galanda Decl., Ex. 3 (Whelan Report, p. 9)). Like Coquille, Cow Creek's status as an Indian tribe was terminated by Congress in 1954; then restored in 1982. 25 U.S.C. § 691 *et seq.*; Pub. L. No. 97-391, 96 Stat. 1960 (Dec. 29, 1982). In 1992, Cow Creek commenced gaming in Cow Creek aboriginal territory on trust land within its reservation in Canyonville, Ex. 3 (Keene Decl. ¶¶5-7), a rural part of Oregon with fewer than 2,000 residents, located 72 miles from Medford. *Id*. Cow Creek employs about 780 tribal and non-tribal employees. *Id.* ¶10. Cow Creek, which has a total enrollment of about 2,030 members, relies on gaming revenue to support two health and wellness centers, educational programs for Tribal children and adults, and a community economic

development and recovery program ("CEDAR"), as well as environmental, cultural resource protection, language, and occupational certification/license programs. *Id.* ¶¶11-12.

### 3. *Karuk*

Since time immemorial, the Karuk people have inhabited the areas of southern Oregon and northeastern California, including what is now the southern-most portion of Jackson County, Oregon. *See* Ex. 6 (Attebery Decl. ¶2). Karuk currently has 3,751 enrolled members and is headquartered in the remote town of Happy Camp, California. *Id*. ¶3. Karuk owns and operates a tribal housing project and its sole casino in its aboriginal territory trust land in rural Yreka, California. *Id*. Karuk's 14,000 square-foot casino is 52 miles from Medford. *Id*. ¶5. Karuk employs 62 Karuk and other Tribal members among its total casino workforce of 207. *Id*. ¶6. Having invested $81 million in the construction of its casino and adjacent businesses, Karuk's gaming revenues are an important source of revenue for medical services, clean drinking water, and educational opportunities for Tribal members, as well as environmental stewardship and fire protection and cultural/traditional resources protection programs. *Id*. ¶7.

### 4. *Tolowa*

Since time immemorial, the Tolowa people have inhabited the areas of southern Oregon and northeastern California, including the Rogue River Valley. Ex.

5 (Thompson Decl. ¶3). Tolowa operates a casino, hotel, and fuel mart in its aboriginal territory and on trust land in Del Norte County, California, 118 miles from Medford. *Id.* ¶14. Tolowa, which has a 2,081 enrolled citizens, relies on gaming revenue to support its healthcare centers and clinics and educational, environmental, and cultural resource protection programs. *Id.* ¶19.

### 5. *Cow Creek, Karuk, and Tolowa's Interests*

In addition to the "here-and-now" harm to Plaintiff-Appellants' constitutional participatory rights resulting from Defendants' FEIS and ROD (*see infra*), the following Cow Creek, Karuk, and Tolowa governmental, economic, socio-economic, cultural, historical, environmental, and ecological interests have been and will be imminently and irreparably harmed by Defendants' unconstitutional and unlawful actions.

### i. Governmental Interests

Plaintiff-Appellants' governments will receive declining gaming and related revenues, as detailed below, thereby reducing the funding available to each Tribal governmental for programs and services essential to the health, safety, and welfare of Tribal members and others residing or working on their respective reservation trust lands. *Id.*; Ex. 3 (Keene Decl. ¶¶11-12, 21); Ex. 6 (Attebery Decl. ¶9); Ex. 5 (Thompson Decl. ¶¶17-20). For example, "Tolowa government budget cuts due to the loss of $1.2 million annually will irreparably harm key governmental

departments and programs," including Head Start, K-12, and higher education; water quality, ocean protection, and emergency management; drinking water and wastewater treatment; family wellness, elder assistance, and cemetery upkeep. Ex. 13 (Ralstin Decl. ¶7). Likewise, Cow Creek imposes gaming and related taxes that result in 100% of its net gaming, hotel, and business revenues being paid to the Tribal government, which uses them to fund essential health care, educational, environmental, and other government services and benefits. Ex. 15 (Hervey Decl. ¶ 3); Ex. 3 (Keene Decl. ¶11); Ex. 15 (Hervey Decl. ¶¶3-5).

ii.    Economic Interests

As the FEIS acknowledges, Plaintiff-Appellants will suffer substantial gross gaming revenue losses due to the loss of customers to Coquille's second casino. Ex. 2 (Galanda Decl., Ex. 2 (FEIS, Vol. II, pp. 4-21-4-23)).

| Tribe | Substitution Effects - Gaming Revenue | Substitution Effects - Non-Gaming Revenue |
|---|---|---|
| Cow Creek | 21.3% - 28.5% | 52.1% |
| Karuk | 23.4% - 37% | 51.7% |
| Tolowa | 5.3% - 13.4% | unknown |

*Id.*; Ex. 4 (Meister Decl., Ex. 3, pp. 2, 6); Ex. 6 (Attebery Decl. ¶¶6-7, Ex. RA-2); Ex. 5 (Thompson Decl. ¶25). With Coquille illegally commencing operation of its second casino, Cow Creek's gaming revenues will now decline by 21.3% to 28.5%, resulting in a 12.3% reduction in Tribal government taxes and funds; Karuk's will now decline by 23.4% to 37%; and Tolowa's will now decline by 5.3% to 13.4%.

13

Ex. 2 (Galanda Decl., Ex. 2 (FEIS, Vol. II, pp. 4-22-4-23)); Ex. 4 at pp. 47, 51 (Meister Decl., Ex. 3); Ex. 6 (Attebery Decl., Ex. RA-2); Ex. 5 (Thompson Decl. ¶ 25); Ex. 15 (Hervey Decl. ¶ 4). Plaintiffs will each be forced to lay off hundreds of employees, including their own people. *See* Ex. 2 (Galanda Decl., Ex. 2 (FEIS, Vol. I, p. 3-16)); Ex. 3 (Keene Decl. ¶¶ 0, 20-22, Ex. 3); Ex. 13 (Ralstin Decl. ¶6); Ex. 15 (Hervey Decl. ¶7).

iii.     <u>Socio-Economic Interests</u>

The loss of jobs resulting from Coquille's second casino will devastate each Plaintiffs' people and community. *See* Ex. 13 (Ralstin Decl. ¶¶6, 9). At Tolowa, for example, "Coquille's Medford casino will have devastating socio-economic impacts" and "will worsen economic disparity in the Tolowa community, increasing poverty [and causing] emotional and spiritual distress" to Tolowa citizens. Ex. 13 (Ralstin Decl. ¶¶9-13). For Cow Creek, there will be significant cuts to Tribal member services and assistance, such as higher education tuition, emergency assistance, elder housing repair assistance, down payment housing assistance, foster care stipends, and food benefits. Ex. 15 (Hervey Decl. ¶5); Ex. 10 (Corbett Decl. ¶¶7-12). Cow Creek has "already started discussing what kinds of cuts [the Tribe] will have to make" in its Education Department, "and the idea of it is devastating." Ex. 12 (Jackson Decl. ¶13).

In addition, Plaintiffs' community grants to non-Tribal organizations promoting the general public's health, safety, education, and welfare will be significantly reduced. Ex. 3 (Keene Decl. ¶¶14-15); Ex. 5 (Thompson Decl. ¶21); Ex. 13 (Ralstin Decl. ¶8). Since 1997, for example, Cow Creek's foundation has invested more than $20 million in Jackson County and six other counties by awarding grants to community nonprofit organizations advocating for healthcare, food security, child abuse prevention, and education. Ex. 3 (Keene Decl. ¶15). As revenues from Cow Creek decline, so will funds available for these Tribal community grants that benefit the greater community. *See id*.

### iv.    Historical Interests

Coquille has falsely claimed to the public that Medford and Jackson County sit within Coquille's aboriginal and historical territory. *See* Ex. 14 (Beckham Decl. ¶11) (documenting Coquille's lack of aboriginal or historical connection to Medford). As a result, a great many Tribal nations aboriginal to both Oregon and California expressed existential and territorial concerns to Federal Defendants about Coquille's falsification of history vis-à-vis its "restored lands" application. *See* Ex. 2 (Galanda Decl. ¶14; Ex. 9 (Karuk Opp. Letter dated 4/14/2016); Ex. 10 (Tolowa Opp. Letter dated 2/23/2023); Ex. 1 (Cow Creek Opp. Letter dated 3/15/2021)); Ex. 8 (Galanda Decl., Ex. 5 (Lytton Opp. Letter dated 12/16/24); Ex. 6 (Dry Creek Opp. Letter dated 12/16/24)).

v.     Environmental Interests

For Karuk, millions of dollars in lost gaming revenues will reduce governmental revenues needed to provide Karuk members clean water; to restore the Klamath River and its "runs of endangered salmon"; and "to combat climate change and mitigate the impacts from and dangers of wild land fires," which have "destroyed" Karuk natural resources in recent years. Ex. 11 (Haskell Decl. ¶¶4, 7, 9).     Likewise, Tolowa and Cow Creek will face substantial cuts to Tribal governmental natural resource and environmental protection efforts. Ex. 3 (Keene Decl. ¶¶11, 21, 23); Ex. 5 (Thompson Decl. ¶¶19, 26; Ex. 6 (Attebery Decl. ¶3; Ex. 13 (Ralstin Decl. ¶¶6-7); Ex. 11 (Haskell Decl. ¶7).

**B.     Procedural Background**

*1.     Coquille's application to establish a second casino in Medford.*

In 2012, Coquille asked Federal Defendants to exercise discretionary authority under the Indian Reorganization Act ("IRA") to take a 2.42-acre parcel in an industrial part of Medford into federal trust status for a second reservation and casino. Ex. 2 (Galanda Decl., Ex. 2 (FEIS, Vol II., p. 1-3)). Coquille asked—based on its misreading of the CRA—for a "restored lands" exception to the Indian Gaming Regulatory Act ("IGRA")'s prohibition on gaming on lands acquired in trust after 1988.  25 U.S.C. § 2719(a). Coquille has since amassed at least 45.3 acres of contiguous land in Medford for its second reservation. Pub. L. No. 101-42, § 5(b);

16

Ex. 3 (Keene Decl.¶30, Ex 2).[3]

Defendant Bureau of Indian Affairs ("BIA") began to process Coquille's application under 25 U.S.C. § 5101 *et seq.*, and its implementing regulations, 25 C.F.R. part 151, issuing letters in February 2013 to state, local, and affected Tribal governments. By 2015, the BIA started preparing an environmental impact statement ("EIS"). 80 Fed. Reg. 2120, 2120 (Jan. 15, 2025).

In May 2020, DOI denied Coquille's application to take the Medford parcel into trust and later discontinued preparation of an EIS. 85 Fed. Reg. 55026, 55026 (Sep. 3, 2020). In doing so, DOI clarified the CRA explicitly made acquisition of the Medford parcel discretionary, and any such acquisition would be "pursuant to [the Secretary's] authority under the [IRA]," *not* the CRA itself, and therefore ineligible for gaming under the restored lands exception. *Id.*

In December 2021, Federal Defendants reversed course, withdrawing DOI's previous denial of Coquille's trust application and resuming EIS preparation. 86 Fed. Reg. 73313, 73313 (Dec. 27, 2021); 87 Fed. Reg. 11084, 11084 (Feb. 28, 2022).

In November 2022, the agency published a Draft Environmental Impact Statement ("DEIS") for Coquille's gaming project. 87 Fed. Reg. 72505, 72505 (Nov.

---

[3] The FEIS concedes that the scope of Coquille's project increased to 7.24 acres but fails to consider the environmental effects of Coquille's acquisition and development of another 38 acres of contiguous, potential reservation land. *Compare* Ex. 2 (Galanda Decl., Ex. 2 (FEIS, Vol II., p. 2-1)), *with* Ex. 3 (Keene Decl. ¶30; Ex. 2).

25, 2022). Despite the significant passage of time since Coquille's original application in 2012, Defendant BIA did not update or request updates to any of the underlying reports on which the DEIS is based. Ex. 3 (Keene Decl., Ex. 2 (DEIS)).

Throughout this NEPA process, Defendants received numerous comments in opposition to Coquille's application. Beginning in 2013 and continuing through today, nearly all governments affected by the ROD, including the State of Oregon and Jackson County, have unambiguously opposed Coquille's proposal to establish a second casino in Medford. *See, e.g.*, Ex. 2 (Galanda Decl., Ex. 4 (Gov. Kotek Opp. Letter dated 4/13/23); Ex. 5 (Jackson Cnty. Comm. Opp. Letter dated 4/30/13)). Federal and state legislators who represent constituents in the greater Medford region have also opposed Coquille's proposed second casino project. *See, e.g.*, *id.*, Ex. 6 (U.S. Sen. Wyden (OR) & Merkley (OR) Opp. Letter dated 12/1/23); Ex. 7 (U.S. Reps. Salinas (OR), Blumenauer (OR), & Huffman (CA) Opp. Letter dated 1/16/24); Ex. 8 (Or. Leg. Assembly Opp. Letter dated 9/21/18); Ex. 8 (Galanda Decl., Ex. 21 U.S. Sen. Wyden (OR) & Rep. DeFazio (OR) Opp. Letter dated 1/25/16)).

### 2. *Defendants issued the FEIS and ROD.*

On November 22, 2024, Federal Defendants published notice of availability of the FEIS regarding Coquille's application to transfer the Medford parcel into trust. *See* Ex. 2 (Galanda Decl., Exs. 1-2 (FEIS, Vols. I & II)); 89 Fed. Reg. 92717, 92717 (Nov. 22, 2024). Throughout the FEIS, Defendants relied on the *ultra vires* CEQ

18

regulations as binding and mandatory, citing them at least 52 times. *See, e.g.*, Ex. 2 (Galanda Decl., Exs. 1-2 (FEIS, Vols. I-II).

Federal Defendants received comments from Plaintiffs, Oregon and California's Governors, other Tribal nations, and local governments in opposition to the FEIS, many highlighting its improper reliance on the CEQ's *ultra vires* regulations, as well as requests for additional time to comment on the FEIS. *See, e.g.*, Ex. 3 (Keene Decl., Ex. 11); Ex. 8 (Galanda Decl., Exs. 2, 7-9, 22, p. 3 (Governor Gavin Newsom on 12/16/24)). Federal Defendants ignored those pleas. *See id.*, Ex. 14.

On January 10, 2025, Federal Defendants issued the ROD. *See* Ex. 8 (Galanda Decl., Ex. 25). The ROD did not alter or amend the FEIS's treatment of the unconstitutional CEQ regulations as binding. *See* Ex. 23 (Galanda Decl. Ex. 25) (ROD). Instead, the ROD cited the CEQ's *ultra vires* regulations at least an additional 13 times. *See generally* Ex. 9 (Galanda Decl., Ex. 25 (ROD)).

On the very same day they issued the ROD, Federal Defendants acquired title to the Medford parcel, in violation of DOI's own regulations. Ex. 17 (Simpson Decl., Ex. U);  25 C.F.R. § 151.13(c)(iii) (2024) (agency will "[i]mmediately acquire the land in trust status . . . *after* the date such decision is issued).

On January 11, 2025, Defendant-Intervenor Coquille commenced gaming activities on the new Medford trust parcel without providing the requisite 120 days'

notice to the NIGC. Ex. 16 (Galanda Decl., Ex. 1). 25 C.F.R. § 559.2(a) ("A tribe shall submit to [the NIGC] a notice that a facility license is under consideration for issuance at least 120 days before opening any new place . . . on Indian lands  . . ."). The NIGC denied Coquille's request for a waiver of the 120 days' notice requirement, which Coquille has ignored, continuing to offer gaming in violation of law. Ex. 17 (Simpson Decl., Ex. V, p. 1), Exs. 19-20 (NIGC letters). As of today, Coquille has been illegally gaming on the Medford trust parcel for *weeks*.

On the first business day after the ROD was issued, January 13, 2025, Appellant Tribal Nations filed an emergency motion for a TRO and preliminary injunction with the District Court. That motion was denied by the District Court on February 19, 2025. *See* Ex. 1.

## III.    JURISDICTION

This Court "shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions . . . except where a direct review may be had in the Supreme Court." 28 U.S.C. § 1292(a)(1); *see* Ex. 1.

## IV.    INJUNCTION STANDARD

A party moving for an injunction pending appeal under FRAP 8(a)(2) "must state the reasons for granting the stay or other emergency relief sought and discuss, with specificity, each of the following factors: (1) the likelihood that the moving

20

party will prevail on the merits; (2) the prospect of irreparable injury to the moving party if relief is withheld; (3) the possibility of substantial harm to other parties if relief is granted; and (4) the public interest." D.C. Cir. R. 8(a)(1); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977). "Any party may request expedited action on a motion on the ground that, to avoid irreparable harm, relief is needed in less time than would ordinarily be required for this court to receive and consider a response." D.C. Cir. R. 27(e).

## V.    ARGUMENT

### A. Plaintiffs Are Likely to Succeed on the Merits.

For regulations to be legally binding, there must be an established nexus between the regulations and some Congressional delegation of legislative authority to issue the regulations. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979). A separation of powers issue arises when an executive or independent agency lacks statutory authority from Congress to issue the regulations. *See Mexichem Fluor v. Env't Prot. Agency*, 866 F.3d 451, 453 (D.C. Cir. 2017).

With respect to the CEQ regulations at issue, 40 C.F.R. part 1500, "[t]he provisions of NEPA provide no support for CEQ's authority to issue binding regulations," as "[n]o statutory language states or suggests that Congress empowered CEQ to issue rules binding on the other agencies." *Marin Audubon*, 121 F.4th at 912.

Nor does any "statute confer[] rulemaking authority on CEQ." *Id*. CEQ instead promulgated its regulations pursuant to Executive Order 11991, which alone cannot result in regulations validly governing the administration of statutes. *Marin Audubon*, 121 F.4th at 912. Thus, Executive Order 11991, which originally directed CEQ to promulgate the regulations at issue, did not result in CEQ's lawful exercise of authority to issue regulations binding other agencies, including DOI. *Id*. Accordingly, this Circuit unambiguously held "the CEQ regulations, which purport to govern how all federal agencies must comply with [NEPA], are *ultra vires*" and thus invalid. *Id*. at 908-15 (vacating agency final action as *ultra vires* because its FEIS relied on unconstitutional CEQ regulations as binding).

The FEIS was based on the unconstitutional CEQ regulations as "binding" regulations, despite this Circuit's invalidation of those very regulations ten days before it issued. *Id.* Federal Defendants cited the invalid CEQ regulations at least 52 times in the FEIS. *See, e.g.*, Ex. 2 (Galanda Decl. Ex. 2 (FEIS, Vol I, pp. 1-1-1-2, 2-1, 3-2, 3-14, 3-18, 3-21, 3-32-3-35, 3-40-3,41; Vol. II, pp. 1-3-1-4, 2-1, 2-26, 2-29, 2-31-2-32, 3-1, 4-1, 4-70, 5-1, 5-5-5-6)). The ROD, too, relies on the invalid CEQ regulations, about 13 times. *See generally* Ex. 9 (Galanda Decl., Ex. 25 (ROD). Defendants' entire NEPA process was improperly "completed in accordance with . . . the [CEQ] Regulations." Ex. 2 (Galanda Decl., Ex. 2 (FEIS, Vol. II, pp. 1-3)); *see e.g.*, (FEIS, Vol. I, p. 1-1) ("Federal agencies *must* follow the *requirements* in the

22

[CEQ] NEPA Regulations 40 CFR § 1500, when responding to comments."); Ex. 9 at 55 (Galanda Decl., Ex. 25 (providing the Mitigation Monitoring and Compliance Plan was "prepared consistent with the *requirements* of 40 CFR § 1501.6(d) and 1505.3(c)") (emphases added).

Federal Defendants further failed to apply DOI's own regulations implementing NEPA, 43 C.F.R. part 46, which they *do* have statutory authority to establish, apart from one fleeting reference in the FEIS. *See* Ex. 2 (Galanda Decl., Ex. 1 (FEIS, Vol. I, p. 3-35)). That is likely because DOI's own regulations implementing NEPA provide they are to be used "for compliance with," to "supplement," and "to be used in conjunction with the CEQ regulations." 43 C.F.R. §§ 46.10(a)(2), 46.20(a); *see id.* § 46.415. Although DOI once stated it was "incorporat[ing]" certain CEQ guidance documents, it never stated the same of the CEQ regulations themselves. *Marin Audubon*, 121 F.4th at 915.

Notably, Federal Defendants neither represented in the FEIS they were "required" to rely on their own NEPA-implementing regulations, 43 C.F.R. Part 46, nor did they rely on those regulations throughout the FEIS. *See* Ex. 2 (Galanda Decl., Exs. 1-2 (FEIS, Vols. 1-II)). Defendants' actions were *ultra vires* when they determined in the FEIS that Coquille's second Medford casino would have no relative environmental (or economic) impact. *See Marin Audubon*, 121 F.4th at 918.

The Court must therefore vacate both the FEIS and ROD and direct Federal Defendants "to take a completely different tack to complete their NEPA review." *Id*.

### C. Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief.

Plaintiff-Appellants will suffer immediate irreparable harm in the absence of emergency injunctive relief. A party seeking an injunction must demonstrate irreparable harm is both "imminent" and "beyond remediation." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016). Plaintiffs satisfy both requirements.

The Supreme Court recognizes plaintiffs bringing separation-of-powers claims they were subjected to "unconstitutional agency authority," amount to a "here-and-now injury" that is "impossible to remedy once the proceeding is over." *Axon Enter., Inc. v. F.T.C.*, 598 U.S. 175, 191 (2023). In *Alpine Securities Corp. v. FINRA*, No. 23-5129, 2023 WL 4703307 (D.C. Cir. July 5, 2023), this Court granted an emergency motion for injunction pending appeal, enjoining the agency from continuing an enforcement proceeding, in part because the appellant

> would suffer an irreparable harm without an injunction because the ongoing FINRA enforcement proceeding would *put it out of business*. *Plus*, the resolution of claims by an unconstitutionally structured adjudicator is a '*here-and-now injury' that cannot later be remedied*.'

*Id.* at *2 (Walker, J., concurrence) (emphasis added).

If the requested injunctive relief is not granted, Plaintiff-Appellants will suffer "here-and-now" injuries resulting from Federal Defendants' unconstitutional NEPA

process, including demonstrated cultural, historical, and existential harms. *See* Ex. 14 (Beckham Decl. ¶11); Ex. 2 (Galanda Decl., Ex. 9 (Karuk Opp. Letter dated 4/14/2016); Ex. 10 (Tolowa Opp. Letter dated 2/23/2023); Ex. 1 (Cow Creek Opp. Letter dated 3/15/2021)).

Because Coquille has already started gaming on the new Medford trust parcel in violation of NIGC's regulations and correspondence, *see* Exs. 20–21, Plaintiffs have already started to experience immediate destruction to their principal economic enterprises due to diminished gaming revenues for Cow Creek (up to 28.5%), Karuk (37%), and Tolowa (13.4%). Ex. 16 (Simpson Decl. ¶7) (Coquille is operating between 30-150 gaming machines *today*);[4] Ex. 4 (Meister Decl., Ex. 3, pp. 2, 6); Ex. 6 (Attebery Decl., Ex. RA-2); Ex. 5 (Thompson Decl. ¶25); *see Wash. Metro.*, 559 F.2d at 843 & 843 n.2 (concluding "the destruction of a business is, of course, an essentially economic injury" that amounts to irreparable harm). Federal Defendants admit the economic harm to Plaintiffs will be substantial. Ex. 2 (Galanda Decl., Ex. 2 (FEIS, Vol. II, pp. 4-22-4-23). Plaintiffs' diminished gaming revenues will *devastate* their Tribal governments writ large. *See* Section II(A)(5), *supra*; *Confederated Tribes of Chehalis Reservation v. Mnuchin*, 456 F. Supp. 3d 152, 164 (D.D.C. 2020) (a final agency action resulting in substantially diminished funding to Tribal governments for "core public services" makes a "very strong showing of

---

[4] The district court overlooked or disregarded this evidence. Ex. 1 at 4.

irreparable harm").

Both U.S. Senators from Oregon opined that Defendants' decision to take the Medford parcel into trust for Coquille's second casino "will irreparably deprive at least three other Tribes of significant gaming revenues from their existing casinos" and "would pit some of our country's most marginalized communities against each other, forcing them to compete in a 'race to the bottom.'" Ex. 2 (Galanda Decl., Ex. 6). Plaintiffs have shown that they will suffer severe, irreparable harm in the absence of an injunction.

> **D.    Balance of Hardships and Public Interest Tip in Plaintiffs' Favor.**

Because Plaintiff-Appellants will suffer severe, irreparable damage if this Court does not grant the requested injunction, and that injunction would result in minimal and purely commercial harm to Coquille (and no harm to Federal Defendants), the balance of hardships weighs in favor of granting Plaintiffs' request. This fact also demonstrates that the injunction is in the public interest. *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) ("'Where, as here, 'the Government is the opposing party,' the last two factors"—the balance of harms and the public interest—"'merge': 'the government's interest *is* the public interest.'").

Federal Defendants' decision to knowingly issue the FEIS based on unconstitutional regulations notwithstanding this Circuit's decision in *Marin Audubon*, 121 F.4th 902, and their unlawful decision to take the parcel into trust in

violation of 25 C.F.R. § 151.13(c)(iii), has permitted Coquille to establish their second casino in urban Medford, which will result in devastating revenue losses to Plaintiffs' casinos, thereby depriving Plaintiffs of essential Tribal government operational funding. Ex. 2 (Galanda Decl., Ex. 1 (FEIS, Vol. I, p. 3-15).

Intervenor-Defendant Coquille is now illegally operating a casino in Medford, having failed to provide the NIGC the required 120-day notice for public health and safety purposes. 25 C.F.R. § 559.2(a); Ex. 16 (Simpson Decl. ¶7) (Coquille is operating between 30-150 gaming machines currently); Ex. 17 (Simpson Decl., Ex. V, p. 1). The effects of Defendants' unlawful final decision are immediate.

In addition, the general public has an interest in an administrative process that conforms to the U.S. Constitution and the statutory requirements mandated by Congress under NEPA and other federal law. *League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."); *see Shawnee Tribe*, 984 F.3d at 102.

Notably, nearly all affected governments that represent the public's interest oppose Coquille's second casino resort in urban Medford, including the State of Oregon, Jackson County, Cow Creek, Karuk, Tolowa, other Tribal Nations, as well as both sitting U.S. Senators from Oregon. Ex. 2 (Galanda Decl., Ex. 4-10); Ex. 8 (Galanda Decl., Ex. 21 U.S. Sen. Wyden (OR) & Rep. DeFazio (OR) Opp. Letter dated 1/25/16)). The public's interest would be served by prohibiting Intervenor-

Defendant Coquille from unlawfully gaming on the parcel until the legality of Federal Defendants' unconstitutional decision has been adjudicated on the merits.

## VI.    CONCLUSION

For these reasons, Plaintiffs respectfully urge the Court to enjoin Intervenor-Defendant Coquille from unlawfully gaming on the Medford parcel—or, alternatively, to divest Federal Defendants of title to the parcel—pending this appeal.

DATED this 19th day of February, 2025.

*/s/ Gabe S. Galanda*
Gabriel S. Galanda
Rachel R. Tobias
Shelby R. Stoner
GALANDA BROADMAN PLLC
P.O. Box 15146
8606 35th Avenue NE, Ste. L1
Seattle, WA 98115
T: 206-557-7509
F: 206-299-7690
gabe@galandabroadman.com
rtobias@galandabroadman.com
shelby@galandabroadman.com
*Attorneys for Plaintiff-Appellants*
*Cow Creek*

Glenn M. Feldman
PROCOPIO, CORY, HARGREAVES &
SAVITCH LLP
4800 N. Scottsdale Road, Ste. 2000
Scottsdale, AZ 85251
T: 480-682-4312
F: 619-788-5521
glenn.feldman@procopio.com

*Attorney for Plaintiff-Appellant Karuk*

Richard J. Armstrong
ARMSTRONG LAW OFFICE
1750 Prairie City Road, Ste. 130-238
Folsom, CA 95630
T: 916-337-2639
armstrong@gaminglawpc.com

*Attorney for Plaintiff-Appellant Tolowa*

## CERTIFICATE OF COMPLIANCE

This brief complies with the page limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,186 words, excluding the cover page, tables of contents and authorities, attorneys' signature block, and certificates of compliance and service. This brief also complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)–(2).

DATED this 19th day of February, 2025.

*/s/ Gabe S. Galanda*
Gabe S. Galanda

## CORPORATE DISCLOSURE STATEMENT
## OF THE COW CREEK BAND OF UMPQUA TRIBE OF INDIANS

The Cow Creek Band of Umpqua Tribe of Indians is a federally recognized tribe located in Southern Oregon and is not a subsidiary of any other corporation; therefore, no publicly held corporation owns 10% or more of its stock. Fed R. App. P. 26.1.

## CORPORATE DISCLOSURE STATEMENT
## OF THE KARUK TRIBE

The Karuk Tribe is a federally recognized tribe located in Northern California and is not a subsidiary of any other corporation; therefore, no publicly held corporation owns 10% or more of its stock. Fed R. App. P. 26.1.

## CORPORATE DISCLOSURE STATEMENT
## OF TOLOWA DEE-NI' NATION

Totowa Dee-ni' Nation is a federally recognized tribe located in Northern California and is not a subsidiary of any other corporation; therefore, no publicly held corporation owns 10% or more of its stock. Fed R. App. P. 26.1.

## CERTIFICATE OF SERVICE

I certify that on February 19, 2025, I caused the foregoing document to be served on Federal Defendants and Intervenor-Defendant Coquille Indian Tribe via U.S. Mail, and sent courtesy copies via email, to the following individuals and their respective addresses:

Angela Ellis
Devon Tice
DOJ-ENRD
150 M Street NE
Washington, DC 20002
202-305-0466
Email: angela.ellis@usdoj.gov
Email: devon.tice@usdoj.gov

*Counsel for Federal Defendants*

Keith M. Harper
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
202-639-6045
Email: KHarper@jenner.com

Judith Amy Shapiro
JUDITH A. SHAPIRO, ESQ.
750 First St NW
Suite 940
Washington, DC 20002
(202) 723-6400
Email: jshapiro@dflylaw.com

Scott D. Crowell
CROWELL LAW OFFICES- TRIBAL ADVOCACY GROUP
1487 W. State Route 89A

Suite 8
Sedona, AZ 86336
(425) 802-5369
Fax: (509) 290-6953
Email: scottcrowell@hotmail.com

*Counsel for Intervenor-Defendant Coquille Indian Tribe*

Jennifer H. Weddle
GREENBERG TRAURIG, LLP
1144 15th St
Suite 3300
Denver, CO 80202
(303) 572-6500
Email: weddlej@gtlaw.com

*Attorneys for Amicus COALITION OF LARGE TRIBES*


     DATED this 19th day of February, 2025.

                      */s/ Gabe S. Galanda*
                      Gabe S. Galanda